FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| DANNY LEE JONES,<br>　　　　*Petitioner-Appellant,*<br><br>　　　　v.<br><br>CHARLES L. RYAN,<br>　　　　*Respondent-Appellee.* | No. 18-99005<br><br>D.C. No.<br>2:01-cv-00384-SRB<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
Hon. Susan R. Bolton, District Judge, Presiding

Argued and Submitted February 16, 2021
San Francisco, California

Filed June 28, 2021

Before: Sidney R. Thomas, Chief Judge, and Michael Daly
Hawkins and Morgan Christen, Circuit Judges

Opinion by Chief Judge Thomas

# SUMMARY[*]

## Habeas Corpus / Death Penalty

Applying the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996, the panel reversed the district court's judgment denying Danny Lee Jones's habeas corpus petition challenging his Arizona death sentence, and remanded to the district court with instructions to issue the writ.

In Claim 1, Jones asserted that his trial counsel was constitutionally ineffective by failing to request a mental health expert in advance of the sentencing hearing.  The panel held that the state court record demonstrates that trial counsel was constitutionally ineffective by failing to secure a defense mental health expert, and that, pursuant to 28 U.S.C. § 2254(d)(1), the Arizona Supreme Court's contrary conclusion was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny.  Holding that the state post-conviction review (PCR) court's decision was also based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2), the panel agreed with Jones that (1) the PCR court employed a defective fact-finding process when it denied PCR counsel's funding request for a defense neuropsychological expert, effectively preventing the development of Claim 1; and (2) the state court's failure to hold a hearing on Claim 1 resulted in an unreasonable determination of the facts.  Because the PCR court did not reach the issue of prejudice, the panel reviewed the issue de

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

novo. Noting that Jones was diligent in attempting to develop the factual basis for the claim in state court, the panel wrote that the district court did not err in its expansion of the record, and the district court considered the evidence developed in the district court in conducting its de novo review. The panel concluded that Jones demonstrated *Strickland* prejudice because there is at least a reasonable probability that development and presentation of mental health expert testimony would have changed the result of the sentencing proceeding.

In Claim 2, Jones asserted that his trial counsel was constitutionally ineffective by failing to seek neurological or neuropsychological testing prior to sentencing. The panel wrote that counsel's failure to promptly seek neuropsychological testing ran contrary to his obligation to pursue reasonable investigations under *Strickland*, and in particular, his obligation to investigate and present evidence of a defendant's mental defect. The panel therefore concluded that the PCR court's decision that defense counsel's performance did not fall below an objectively reasonable standard was an unreasonable application of *Strickland*, and that Jones satisfied § 2254(d)(1). The panel also held that the state PCR court's decision was based on an unreasonable determination of the facts, satisfying § 2254(d)(2), where the PCR judge made factual findings regarding the necessity of neuropsychological testing, not on the basis of evidence presented by Jones, but on the basis of his own personal conduct, untested memory, and understanding of events—and by plainly misapprehending the record, which included a forensic psychiatrist's testimony, six years earlier, strongly suggesting that neuropsychological testing was essential. Because the PCR court did not reach the issue of prejudice, the panel reviewed the issue de novo.

Noting that Jones was diligent in attempting to develop the factual basis for the claim in state court, the panel wrote that the district court did not err in its expansion of the record, and the district court considered the evidence developed in the district court in conducting its de novo review. The panel concluded that Jones demonstrated *Strickland* prejudice because there is a reasonable probability that had such testing been conducted, and had the results been presented at sentencing, Jones would not have received a death sentence.

## COUNSEL

Amanda Bass (argued) and Letitia Marquez, Assistant Federal Public Defenders; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Petitioner-Appellant.

Jeffrey L. Sparks (argued), Assistant Attorney General; Lacey Stover Gard, Chief Counsel; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Respondent-Appellee.

## OPINION

THOMAS, Chief Judge:

Danny Lee Jones, an Arizona inmate on death row, appeals the district court's denial of his petition for writ of habeas corpus on remand from this court and the Supreme Court of the United States. Applying the appropriate standards pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we conclude that Jones was denied the effective assistance of counsel at sentencing. We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

I[1]

A

On March 26, 1992, in Bullhead City, Arizona, Jones and his friend Robert Weaver spent the day drinking and using crystal methamphetamine in Weaver's garage. At some point, a fight broke out, and evidence at trial indicated that Jones hit Weaver over the head multiple times with a wooden baseball bat, killing him. Jones then went inside the house where he encountered Weaver's grandmother, Katherine Gumina. Jones struck Gumina in the head with the bat and knocked her to the ground. Jones then made his way to a

---

[1] In accordance with our obligation under *Cullen v. Pinholster*, 563 U.S. 170 (2011), to consider only the state court record in conducting our 28 U.S.C. § 2254(d) analysis, this recitation of the facts looks only to that record. Evidence developed at the federal evidentiary hearing is included later in the limited contexts where *Pinholster* does not circumscribe our consideration of such evidence.

bedroom where he found Tisha Weaver, Weaver's seven-year-old daughter, hiding under the bed.  Evidence showed that Jones hit Tisha in the head with the bat, and either strangled her or suffocated her with a pillow.  Jones fled to Las Vegas, Nevada, where police eventually arrested him.  He was indicted in Arizona on two counts of murder in the first degree, and one count of attempted murder.[2]

B

A public defender was assigned to Jones's case.  At the time, the public defender had been an attorney for a little more than three years, and he had never been lead attorney on a capital case.  He requested $5,000 from the trial court for expert witnesses.  The court authorized $2,000, which the public defender split between a crime scene investigator and an addictionologist.

The jury convicted Jones on all counts.  Judge James Chavez scheduled the sentencing hearing for three months later.  About six weeks before the hearing, counsel took his first trip to Reno, Nevada, in order to speak with Jones's mother, Peggy Jones[3], and Jones's second step-father, Randy Jones, in order to investigate potential mitigation evidence.

At sentencing, the public defender presented testimony from two witnesses: investigator Austin Cooper and Randy

---

[2] Gumina initially survived the attack and was in a coma for seventeen months before eventually dying from her injuries.  The prosecution never amended the indictment after Gumina died.

[3] To avoid confusion, we refer to the members of Jones's family by their first names.

Jones. Cooper testified about evidence regarding an alleged accomplice. Randy explained that he married Peggy when Jones was seven years old.[4] He explained that Peggy gave birth to Jones when she was only fifteen years old and had numerous complications during the pregnancy and delivery. Randy testified that Jones suffered multiple head injures when he was growing up, and that when Jones was thirteen or fourteen his personality began to change drastically. Jones started lying, cutting classes at school, drinking, and doing drugs. Jones's first step-grandfather introduced him to marijuana when he was about ten years old, and Jones was an alcoholic by the time he was seventeen.

The trial court appointed the Chief of Forensic Psychiatry for the Correctional Health Services in Maricopa County, Dr. Jack Potts, to examine Jones and provide a report to the court pursuant to Rule 26.5 of the Arizona Rules of Criminal Procedure. Defense counsel called Dr. Potts to testify at sentencing. Dr. Potts stated that in conducting his review, he spent four hours interviewing Jones in prison, one and a half of which were spent administering a personality test. He also spoke to Jones for a couple of hours the day before testifying at the sentencing hearing. He interviewed Peggy by phone for thirty minutes, and he spoke to Randy for one hour the day before testifying. During Dr. Potts's testimony, the following colloquy took place:

> Q. Do you feel you have been provided with adequate data, coupled with your in-person examination of the defendant, to

---

[4] The record is inconsistent whether Randy and Peggy married when Jones was seven or eight years old.

make a conclusion for mitigating findings that you did?

A. . . . I believe everything I reviewed and what I have heard about the case and reviewed with the defendant, his comments to me. I would have liked, and I think I have—I think it would be valuable to have had some neurologic evaluations, not—by a neurologist, clinical exam, such as a CAT scan, possibly an MRI, possibly EEG, possibly some sophisticated neurological testing, because I think there's very strong evidence that we have . . . , I believe, of traumatic brain injury, and there's some other evidence that I believe we may have organic neurologic dysfunctions here that has gone on since he's been about 13. So, there's some other testing that I think would be valuable to have to pin down the diagnosis. . . .

Q. And you think that further testing might shed some additional light on, perhaps, some of these factors you listed and maybe why Mr. Jones behaves in the way he did on March 26, 1992?

A. Yes. I think it could help in clarifying and giving us etiology as the behavioral components, the explosive outbursts, the aggression, the mood changes, and the changes that occurred in his personality as noted by his mother when he was about 13, 14 years old.

Q. In your opinion, could that information possibly provide . . . a significant mitigating factor as to what would be relevant to the issues at this hearing?

A. Clearly I think it would be corroborative of my clinical impressions and my diagnostic impressions in my report.

Dr. Potts discussed the fact that Jones's first step-father physically and verbally abused Jones, and stated that it was "unequivocal" that Jones carried that abuse with him into his adult life. Dr. Potts also stated that given the long history of substance abuse and other psychological problems in Jones's family, Jones was predisposed to substance abuse or a possible affective disorder. Dr. Potts did not, however, give a specific diagnosis, but stated: "I think . . . to a reasonable degree of medical certainty that the defendant suffers from a psychothymic disorder, which is a mood disorder, possibly organic syndrome, secondary to the multiple cerebral trauma that he's had as well as the prolonged substance abuse."

Dr. Potts testified that the drugs and alcohol Jones had on the day of the murders would have had a significant effect on Jones because "it's real clear that the brain is much more susceptible when it's been injured by drugs. Furthermore, when you're on drugs, you are more susceptible to the acts of aggression under amphetamines." He further stated: "I believe in my experience in cases like this, is that had it not been for the intoxication, the alleged offense would not have occurred."

Dr. Potts also submitted a six-page report to the court. The report included: approximately two pages describing

Jones's social development and history, including his medical history, one page of analysis, and one page of recommendations. Dr. Pott's report was due to the court on November 29, 1993, but he did not complete it until December 3. He was late because he did not receive the Presentence Information Report ("PSR") from the Mohave County probation department until December 1. Dr. Potts also testified at sentencing that he was under "significant time pressure" in preparing the report. Dr. Potts concluded that "Mr. Jones' capacity to conform his conduct to that of the law was clearly impaired at the time of the offenses. . . ." He therefore recommended that an aggravated sentence should not be imposed.

After Dr. Potts testified, counsel moved for a continuance so an expert could conduct psychological testing. Counsel stated: "It's not a delay tactic . . . [I]t's not something I planned on doing until . . . very recently after the report was done, after talking with Dr. Potts, after exploring all these issues." Notably, however, counsel did not speak to Dr. Potts about the report until December 7, the night before sentencing. The sentencing judge considered and rejected the motion:

> THE COURT: . . . . I also know that there were funds made available to the defense at some point and you used them to hire [an addictionologist]. . . . [I]f there were any follow-up questions of a psychological or neurological nature, I would think that the defense would have followed them up.
>
> COUNSEL: But, Your Honor, respectfully, . . . I didn't realize this issue was

that important until Dr. Potts brought it up or
I would have certainly asked for the funds
earlier.

The judge found the following aggravating factors for
Weaver's murder: (1) Jones "committed the offense as
consideration for the receipt, or in expectation of the receipt
of anything of pecuniary value"; (2) Jones "committed the
offenses in an especially heinous or depraved manner"; and
(3) Jones was "convicted of one or more other homicides . . .
which were committed during the commission of the
offense."

The judge found four non-statutory mitigating factors:
(1) Jones suffered from long-term substance abuse; (2) he
was under the influence of drugs and alcohol at the time of
the offense; (3) he had a chaotic and abusive childhood; and
(4) his longstanding substance abuse problem may have been
caused by genetic factors and aggravated by head trauma.
The judge found the same aggravating and mitigating
circumstances for Tisha's murder, but he also found that
Tisha's having been under fifteen years old was an additional
aggravating factor.  The judge sentenced Jones to two death
sentences for the murders, and twenty-five years without the
possibility of parole for the attempted murder.  The Arizona
Supreme Court affirmed Jones's conviction and sentence on
direct review.  *State v. Jones*, 917 P.2d 200 (1996).

C

Prior to filing Jones's state post-conviction review
("PCR") petition, PCR counsel sought authorization from the
court for the funding of several experts.

As relevant here, the PCR court rejected counsel's request to appoint a neuropsychologist.  The court stated that while Dr. Potts might not have been a defense expert, he did a good job, gave "defense opinions," and there was no reason to believe that an expert appointed for the defense "would have been any different."  The court concluded by stating that based on Dr. Potts's testimony, "I don't really see any grounds for any additional psychiatric or psychological testing."

On July 1, 1999, counsel filed the PCR petition, raising twenty-five claims.  Among the petition's exhibits were a declaration from defense trial counsel and an affidavit from Peggy.  At an informal conference on February 23, 2000, the court ruled on several of Jones's claims, and set others for an evidentiary hearing.  In particular, the court denied Claim 1 (as numbered in this appeal) on the merits.  The court set Claim 2 (as numbered in this appeal), as well as other claims, for evidentiary hearing.

At the evidentiary hearing, Randy, Peggy, and defense trial counsel testified.  Randy testified that he first spoke to counsel in July 1992, a few months after Jones's arrest.  During this conversation, Randy told counsel about Jones's head injuries, as well as his struggles with substance abuse and stints in rehabilitation programs.  Randy next spoke to counsel when he came to visit Peggy and Randy at their home in Reno in October 1993, about six weeks before sentencing.

Peggy testified that she had provided counsel with a chronology of Jones's life during counsel's visit.  Peggy remembered sharing about Jones's difficult birth and the physical abuse she and Jones suffered at the hands of Jones's biological father and first step-father.  Peggy shared that

Jones had a good home life and a normal childhood once she married Randy, when Jones was about seven or eight years old.

Trial counsel testified that at the time he was appointed to represent Jones, he had been an attorney for three and a half years and his experience with capital cases consisted of having been second chair at the penalty phase in one prior case. He stated that his strategy for defending the killing of Robert Weaver was self-defense, so he hired Dr. Sparks as an addictionologist to testify about Jones's state of mind. Dr. Sparks opined at trial that because of the drugs Jones ingested, he was unable to premeditate the killings. Dr. Sparks was not called to testify at sentencing.

When PCR counsel asked trial counsel if he visited Jones's family early enough in the case to adequately develop mitigation evidence, trial counsel responded that Dr. Potts was able to make effective use of the information obtained from the family. He said that Dr. Potts was a "very favorable mitigation witness for the defense." He stated that it felt to him like Dr. Potts was part of the defense team, even though he was appointed as a court expert. Finally, counsel stated that he did not consider the need for testing by a neuropsychologist until Dr. Potts suggested it to him on December 7, 1993, the evening before Jones's sentencing hearing.

In the affidavit he provided as an exhibit to the PCR petition, trial counsel stated that he asked the court for $5,000 for expert witnesses at trial. When the trial court authorized only $2,000 of the $5,000 he requested, he "was of the opinion that it would be fruitless to ask the court for additional funding for any other needed experts such as an

independent psychiatrist or psychologist." Counsel added that he did not ask his supervisor for any money because he believed that the public defender's office did not have sufficient funds for retaining expert witnesses.

After the hearing, the PCR court denied Claim 2 as well as the remaining pending claims. As to Claim 2, the court stated that "[t]he report and testimony of Dr. Potts[,] who was appointed by the Court, adequately addressed defendant's mental health issues at sentencing."

Jones filed a petition for review in the Arizona Supreme Court, which it denied on February 13, 2001.

D

Jones subsequently filed his federal petition for habeas relief. The district court granted an evidentiary hearing with regard to Claims 1 & 2 based on trial counsel's failure to secure the appointment of a mental health expert and failure to move for neurological and neuropsychological testing.

The district court subsequently dismissed both ineffective assistance of counsel ("IAC") claims. The court denied Claim 1 because counsel's "failure to seek the appointment of a mental health expert in a more timely manner did not prejudice Petitioner." The district court explained that "the Court has not been presented with evidence confirming that Petitioner suffers from neurological damage caused by head trauma or other factors. Therefore, Dr. Potts's finding at sentencing remains the most persuasive statement in the record that neurological damage constituted a mitigating factor." The district court dismissed Claim 2 after finding that Jones could only prove that he suffered from AD/HD

residual type and possibly a low level mood disorder. The district court "conclud[ed] that the trial court would have assigned minimal significance to testimony indicating that Petitioner suffered from ADHD [sic] and a low-level mood disorder, and that this weight would not have outbalanced the factors found in aggravation."

E

Jones timely appealed the district court's denial of his petition for a writ of habeas corpus. We reversed the district court and concluded that Jones received IAC warranting relief on his claims regarding his counsel's failure to secure the appointment of a mental health expert, failure to timely move for neurological and neuropsychological testing, and failure to present additional mitigation witnesses and evidence. *See Jones*, 583 F.3d at 636.

The State petitioned for certiorari. The Supreme Court granted the petition, vacated our judgment, and remanded the case for further consideration in light of *Cullen v. Pinholster*, 563 U.S. 170 (2011). *See Ryan v. Jones*, 563 U.S. 932 (2011).

On remand from the Supreme Court, we remanded the case to the district court to consider, under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc), "Jones's argument that his ineffective assistance of counsel claims are unexhausted, and therefore procedurally defaulted, and that the deficient performance by his counsel during his post-conviction relief case in state court excuses the default." *Jones v. Ryan*, 572 F. App'x 478 (9th Cir. 2014) (Mem.). We expressed "no opinion on any other issue raised on appeal," and noted that "[t]hose issues

are preserved for later consideration by the Court, if necessary." *Id.*

On remand, the district court rejected Jones's arguments. The district court determined that Jones's claims had not been fundamentally altered, and therefore, they had previously been exhausted and were not subject to de novo review. Additionally, the court concluded that PCR counsel was not ineffective as required by *Martinez*, so any default would not be excused anyway. 566 U.S. 1. Jones filed a timely notice of appeal and stated that he was also appealing "all prior orders disposing of other claims, either on the merits or procedurally."

II

We review de novo a district court's dismissal of a habeas petition. *Sexton v. Cozner*, 679 F.3d 1150, 1153 (9th Cir. 2012). We review a district court's findings of fact for clear error. *Stanley v. Schriro*, 598 F.3d 612, 617 (9th Cir. 2010).

Because Jones filed his petition after April 24, 1996, AEDPA applies to our review of this petition. *See Summers v. Schriro*, 481 F.3d 710, 712 (9th Cir. 2007). Under AEDPA, habeas relief may not be granted unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

"A state court decision is 'contrary to' clearly established Supreme Court precedent if the state court applies a rule that

contradicts the governing law set forth in Supreme Court cases *or* if the state court confronts a set of facts materially indistinguishable from those at issue in a decision of the Supreme Court and, nevertheless, arrives at a result different from its precedent." *Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004) (citing *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). A state court's decision is an "unreasonable application" of federal law if it "identifies the correct governing principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (internal quotations and citation omitted). The Supreme Court has explained that the exceptions based on "clearly established" law refer only to "the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000) ("*Terry Williams*"). Circuit precedent may not clearly establish federal law for purposes of § 2254(d), but we may "look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

With respect to § 2254(d)(2) claims, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). If "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)).

If a petitioner can overcome the § 2254(d) bar with respect to the claims the state court did address, he must also

demonstrate that he is entitled to relief without the deference required by AEDPA. *See Panetti v. Quarterman*, 551 U.S. 930, 953–54 (2007). Where the state court did not reach a particular issue, § 2254(d) does not apply, and we review the issue de novo. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *see also Weeden v. Johnson*, 854 F.3d 1063, 1071 (9th Cir. 2017) ("Because the [state court] did not reach the issue of prejudice, we address the issue de novo.").

Pursuant to *Pinholster*, our § 2254(d) analysis is limited to the facts in the state court record. 563 U.S. at 185. However, in narrow circumstances, when we review a claim de novo, and when a petitioner satisfied the standard for an evidentiary hearing in federal district court pursuant to § 2254(e)(2) by exercising diligence in pursuing his claims in state court, we may consider the evidence developed in federal court. *See id.*; *see also id.* at 212–13 (Sotomayor, J., dissenting); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 n.1 (2007).

III

In Claims 1 and 2, Jones alleges that his counsel provided IAC at sentencing. To prove a constitutional violation for IAC, Jones must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient if, considering all the circumstances, it "fell below an objective standard of reasonableness . . . . under prevailing professional norms." *Id.* at 688. Under this objective approach, we are required "to affirmatively entertain" the range of possible reasons counsel might have proceeded as he or she did. *Pinholster*, 563 U.S. at 196. To establish prejudice under *Strickland*, a petitioner

must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Our review of a *Strickland* claim under § 2254(d) is "doubly deferential," requiring the court to apply AEDPA deference on top of *Strickland* deference. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Because the state court reached only the deficient performance prong of Jones's IAC claims, we review only that prong under § 2254(d) and we review the prejudice prong of his claims de novo.

IV

A

In Claim 1, Jones asserts that his trial counsel was constitutionally ineffective by failing to secure a defense mental health expert. He asserts that his right to counsel was violated when his attorney failed to request a mental health expert in advance of the sentencing hearing. For the reasons below, we agree.

The state court record demonstrates that counsel's failure to timely seek a mental health expert fell below "prevailing professional norms." *Strickland*, 466 U.S. at 688. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. Counsel has an "obligation to conduct a thorough investigation of the defendant's background." *Terry Williams*, 529 U.S. at 396 (citing American Bar Association ("ABA") Standards for Criminal

Justice 4–4.1, commentary, p.4–55 (2d ed 1980)). "Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 106 (2011)). And further, counsel's failure to investigate and present evidence of a defendant's mental defect constitutes deficient performance. *Terry Williams*, 529 U.S. at 396. In light of *Terry Williams*, we have also held that counsel's performance may be deficient "if he 'is on notice that his client may be mentally impaired,' yet fails 'to investigate his client's mental condition as a mitigating factor in a penalty phase hearing.'" *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002) (quoting *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995)). Such performance is deficient because "[a]t the penalty phase, counsel's duty to follow up on indicia of mental impairment is quite different from—and much broader and less contingent than—the more confined guilt-phase responsibility." *Bemore v. Chappell*, 788 F.3d 1151, 1171 (9th Cir. 2015). "[I]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase." *Id.* (quoting *Wharton v. Chappell*, 765 F.3d 953, 970 (9th Cir. 2014)). Moreover, the failure to "make even [a] cursory investigation" into available means of obtaining additional funding for expert witnesses may amount to deficient performance under *Strickland*. *See Hinton*, 571 U.S. at 274.

Additionally, the 1989 ABA Guidelines[5] in effect at the time of Jones's sentencing, explain that in capital cases, "[c]ounsel should secure the assistance of experts where it is necessary or appropriate for: . . ." "the sentencing phase of the trial," and the "presentation of mitigation." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.4.1(d)(7), p. 16 (1989). The Guidelines explain that "[i]n deciding which witnesses and evidence to prepare for presentation at the sentencing phase, counsel should consider the following: . . . Expert witnesses to provide medical, psychological, sociological or other explanations for the offense(s)[.]" *Id.* at Guideline 11.8.3(F)(2), p. 23–24. The Guidelines also note that, among the topics the defense should consider presenting at sentencing, is "[m]edical history (including mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays)" as well as "[e]xpert testimony concerning [the client's medical history] and the resulting impact on the client, relating to the offense and to the client's potential at the time of sentencing." *Id.* at Guideline 11.8.6(B)(1)&(8), p. 25–26.

---

[5] We may look to the ABA Guidelines as indicators of the prevailing norms of practice at a given time. *See Strickland*, 466 U.S. at 688 ("Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what [performance] is reasonable, but they are only guides."); *see also Rompilla*, 545 U.S. at 387 n.7 (using language of 1989 and 2003 ABA Guidelines to evaluate performance at 1988 trial); *Florida v. Nixon*, 543 U.S. 175, 191 (2004) (using 2003 ABA Guidelines to evaluate counsel's performance at trial); *but see Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) ("*Strickland* stressed, however, that American Bar Association standards and the like are only guides to what reasonableness means, not its definition. We have since regarded them as such." (citations and quotations omitted)).

Moreover, "[t]he timing of this investigation is critical." *Allen v. Woodford*, 395 F.3d 979, 1001 (9th Cir. 2005) (quotation and citation omitted); *see also Heishman v. Ayers*, 621 F.3d 1030, 1036–37 (9th Cir. 2010). The Supreme Court has found constitutional error "where counsel waited until one week before trial to prepare for the penalty phase, thus failing to adequately investigate and put on mitigating evidence." *Allen*, 395 F.3d at 1001 (citing *Terry Williams*, 529 U.S. at 395). "If the life investigation awaits the guilt verdict, it will be too late." *Id.* (citation and quotation omitted). "[L]egal experts agree that preparation for the sentencing phase of a capital case should begin early and even inform preparation for a trial's guilt phase[.]" *Id.* "Counsel's obligation to discover and appropriately present all potentially beneficial mitigating evidence at the penalty phase should influence everything the attorney does before and during trial[.]" *Id.* (citation and quotation omitted). Moreover, the 1989 ABA Guidelines state that "[c]ounsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial[,]" and "[b]oth investigations should begin *immediately upon counsel's entry into the case and should be pursued expeditiously*." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.4.1(A), p. 13 (1989) (emphasis added); *see also id.* at Guideline 11.8.3, p. 23 ("[P]reparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case.").

The state court record shows that counsel was on notice that Jones may have been mentally impaired, yet counsel failed to investigate Jones's mental condition as a mitigating factor, and he failed to obtain a defense mental health expert. Counsel was in possession of medical records showing that

Jones formerly attempted suicide at age twenty-two; Peggy told counsel that Jones experienced extreme moods swings, but these swings stabilized when he had been medicated with lithium; and Peggy and Randy told counsel that Jones was "often a disturbed child," and they had to seek psychiatric help for him at age nine. This evidence would have led a reasonable attorney to investigate further and obtain a defense mental health expert. *See Wiggins v. Smith*, 539 U.S. 510, 527–28 (2003).

An investigation into Jones's mental health should have been pursued far in advance of when counsel requested that Jones undergo a mental health examination pursuant to Arizona Rule of Criminal Procedure 26.5. Counsel should have obtained a defense mental health expert well before the start of the guilt phase of Jones's trial, but instead, he waited to make this request until after Jones had already been convicted on September 13, 1993. *See Allen*, 395 F.3d at 1001.

Obtaining the court-appointed, independent expert's short and cursory evaluation did not satisfy this duty. *See Lambright v. Schriro*, 490 F.3d 1103, 1120–21 (9th Cir. 2007) ("Counsel may not rely for the development and presentation of mitigating evidence on the probation officer and a *court appointed* psychologist. . . . The responsibility to afford effective representation is not delegable to parties who have no obligation to protect or further the interests of the defendant." (emphasis added)). Moreover, Dr. Potts's evaluation and opinions were limited in that he was a psychiatrist not trained in matters involving organic brain function—information that a neuropsychologist could have developed and presented. Dr. Potts had no obligation to further the interests of the defendant, even if he did present a

defense-favorable opinion, and his expertise and evaluation did not extend to the precise topic—organic brain function—that was essential in Jones's case.

Finally, the state court record establishes that the failure to obtain a defense expert here cannot be justified as a reasonable strategic decision. First and foremost, counsel's failure to obtain a mental health expert was based not on strategy, but on lack of preparation, which left counsel unaware of the importance of this evidence. Counsel failed to speak adequately to Jones and Jones's family to obtain a full picture of Jones's mental health history. For instance, even though when Jones was interviewed for the PSR, Jones reported he was "mentally abused by his first step-father, and later physically abused by a second step-father," and he characterized his childhood as "bad and unhappy," when questioning Dr. Potts at sentencing, defense counsel brushed aside a mention of Randy's physical abuse, referring to it as "clearly a mistake," even though the information came from Jones himself.

Given this lack of preparation, unsurprisingly, counsel stated that he never even considered the need for testing by a neuropsychologist until Dr. Potts suggested it to him the evening before Jones's sentencing hearing. He attested that

> prior to meeting with Dr. Jack Potts, M.D. on December 7, 1993 to discuss his evaluation of Danny Jones, [he] was not aware that neurological or neuropsychological testing was necessary and available which could determine the exact nature of injuries to Danny Jones' brain from long term substance

> abuse and head injury and the resulting affect
> on his behavior and conduct.

This fell below a reasonable standard of performance given the indications that Jones likely suffered from some form of mental illness.

Although we need "not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions," *Harrington*, 562 U.S. at 109 (quoting *Wiggins*, 539 U.S. at 526–27), even imagining one potential strategic reason for counsel's failure to obtain an expert—that the defense could not afford one—the failure to attempt to obtain a defense expert was neither reasonable nor informed. In the declaration he provided in the state PCR proceeding, defense counsel stated that he believed "the Mohave County Public Defender's Office did not have sufficient monies for retaining expert witnesses," and so he "did not ask Mr. Everett [the Mohave Public Defender] for any funding for additional necessary experts in *State vs. Jones*." But according to Kenneth Everett's affidavit provided to the state PCR court, "[i]n the last quarter of 1993, approximately Seven Thousand ($7,000.00) Dollars would have been available for experts . . . in regard to all cases that the Public Defender had in that last quarter, including the Danny Lee Jones case." Everett also stated that during the relevant time period, counsel "perhaps could have expended additional funds for experts for additional mitigation evidence," although he did recognize that counsel needed "to be circumspect" about requesting such funds.[6] But, contrary

---

[6] Counsel could also have gone back to the trial court for additional funding. In granting only $2,000 of counsel's $5,000 request for funding, the court stated that:

to the Supreme Court's ruling in *Hinton*, counsel never even looked into requesting funding through the Public Defender's Office. *See Hinton*, 571 U.S. at 274 (trial attorney's failure to request additional funding was deficient when he mistakenly believed he had received all the funding available).

In sum, the state court record demonstrates that trial counsel was constitutionally ineffective by failing to secure a defense mental health expert. Thus, pursuant to § 2254(d)(1), the Arizona Supreme Court's contrary conclusion was an unreasonable application of *Strickland* and its progeny.

B

Alternatively, Jones argues that the state PCR court's decision was based on an unreasonable determination of the facts under § 2254(d)(2). He argues that the court employed a defective fact-finding process with respect to Claim 1 when it denied PCR counsel's funding request for a defense neuropsychological expert, effectively preventing the factual development of this claim. He also asserts that the state court's failure to hold a hearing on Claim 1 resulted in an

---

> If this is all you need pretrial, you may need more at trial, and then of course the sentencing hearing if we get that far, so—but, I am willing to go $2,000 prior to trial, and then with the understanding that I am willing to listen again if you need more.

*Jones*, 583 F.3d at 629 n.2. Although this statement may not have been specifically included in the state court record, there is no doubt the PCR court was aware of it; the same judge who sentenced Jones to death presided at his PCR hearing.

unreasonable determination of the facts. We agree with both arguments.

Under § 2254(d)(2), a petitioner may challenge a state court's conclusion that is based upon an unreasonable determination of the facts. We have noted that § 2254(d)(2) challenges "come in several flavors." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014). For instance, we have stated that a petitioner may overcome the § 2254 (d)(2) bar if the fact-finding "process employed by the state court is defective." *Id.* at 999 (citing *Nunes v. Mueller*, 350 F.3d 1045, 1055–56 (9th Cir. 2003)). "We have held repeatedly that where a state court makes factual findings without an evidentiary hearing or other opportunity for the petitioner to present evidence, the fact-finding process itself is deficient, and not entitled to deference." *Hurles v Ryan*, 752 F.3d 768, 790 (9th Cir. 2014) (amended) (quotations omitted); *see also Perez v. Rosario*, 459 F.3d 943, 950 (9th Cir. 2006) (amended) ("In many circumstances, a state court's determination of the facts without an evidentiary hearing creates a presumption of unreasonableness."). This is particularly the case where a judge bases factual findings on their own personal conduct, untested memory, or understanding of events in the place of an evidentiary hearing. *See Hurles*, 752 F.3d at 791 (finding it "especially troubling" when a judge's factual findings involved her own conduct and were based on her "untested memory and understanding of the events"). Similarly, a fact-finding process may be fatally undermined "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim." *Taylor*, 366 F.3d at 1001; *see also Wiggins*, 539 U.S. at 528. And

likewise, a fact-finding process may be deemed defective when the end result requires the court to make a finding on "an unconstitutionally incomplete record." *Milke v. Ryan*, 711 F.3d. 998, 1007 (9th Cir. 2013). For a petitioner to prevail on these types of § 2254(d)(2) arguments, however, "we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Taylor*, 366 F.3d at 1000.

The PCR court's decision not to hold a hearing on Claim 1 amounted to an unreasonable determination of the facts. The court ruled on Claim 1 without holding an evidentiary hearing because it found that Dr. Potts essentially satisfied the role of a defense mental health expert. In response to PCR counsel's argument that a defendant is entitled to his own mental health expert in capital cases, not a court-appointed independent expert, the court explained that:

> Dr. Potts was a very good expert. He was defense oriented. The prosecutor, I can remember, was very upset about that. . . . I'm going to deny [this claim] because I don't think counsel was ineffective as far as Dr. Potts.

The fact that the PCR court made this factual finding regarding Dr. Potts's role without holding an evidentiary hearing or opportunity for Jones to present evidence, suggests that the PCR court's fact-finding process was deficient. *See Hurles*, 752 F.3d at 790. However, the process was even more unreasonable because, even though more than six years had passed, the judge based this finding solely on his own

untested memory and personal impression of Dr. Potts's role in the sentencing hearing. *See id.* at 791. The judge who presided over Jones's state PCR proceeding was the same judge who sentenced him to death, and in denying a hearing on this claim, the judge relied primarily on his personal recollection of Dr. Potts's testimony and his memory that the prosecution was upset that Dr. Potts testified favorably for the defense. There is no evidence the PCR court considered anything else in denying the request for a hearing.

The PCR court "plainly misapprehend[ed]" the record in making its finding that Dr. Potts satisfied the role of a defense mental health expert. *See Taylor*, 366 F.3d at 1001. Dr. Potts was not a defense expert, and the fact his conclusions were favorable to the defense does not support that he filled that role. Nothing about the circumstances of Dr. Potts's testimony suggests otherwise. Dr. Potts testified at Jones's sentencing hearing that he regularly prepares psychological reports requested by the courts, that "at times are favorable apparently for the State" and at other times are favorable "for the defense[.]" He also explained that in other cases like Jones's, he had found little or no mitigation for the defendant. Moreover, the limited amount of time Dr. Potts spent on his report and the level of analysis and detail that report provided do not support the conclusion that he was an advocate for the defense team. Dr. Potts submitted only a six-page report to the court. He agreed that he was under "significant time pressure" in preparing the report because he received the PSR late from Mohave County. He met with Jones for a total of four hours at the prison, and spent one and a half hours of that time administering an MMPI personality test. On the day before he testified, Dr. Potts also spoke to Jones for "a couple of hours," Peggy for about thirty minutes, and Randy for one

hour. Dr. Potts also specified that it would have been helpful and

> valuable to have had some neurologic
> evaluations, not – by a neurologist, clinical
> exam, such as a CAT scan, possibly an MRI,
> possibly EEG, possibly some sophisticated
> neurological testing, because I think there's
> very strong evidence that we have – well,
> there's clear evidence that we have, I believe,
> of traumatic brain injury, and there's some
> other evidence that I believe we may have
> organic neurological dysfunctions here that
> has gone on since he's been about 13. So
> there's some other testing that I think would
> be valuable to have to pin down the diagnosis.

Nothing about Dr. Potts's role in the sentencing hearing suggests that he had stepped into the shoes of a defense expert.

The PCR court's decision not to fund a defense mental health expert fatally undermined the fact-finding process, in part because that decision resulted in the court ruling on an unconstitutionally incomplete record. Without funding for a mental health expert, it was impossible for Jones to demonstrate that he had been prejudiced by counsel's failure to obtain one during the course of Jones's criminal proceedings. Jones could not demonstrate the inadequacy of counsel's mitigation case without providing the mitigation evidence that could have been presented by a defense neuropsychological expert. Moreover, without funding, Jones could not show that a defense neuropsychological expert would have presented materially different evidence

than that already provided by Dr. Potts. By failing to provide additional funding to develop Jones's mental health mitigation evidence, the state court, as Jones phrases it, created "its own self-fulfilling prophecy," by preventing the development of the claim before it was even presented.

We emphasize that we are not suggesting that any denial of an evidentiary hearing or denial of funding for an expert would lead to a deficient fact-finding process in state court. Our determination is expressly limited to the facts of this case: The judge denied an evidentiary hearing based on his personal recollection of a sentencing proceeding that took place six years prior—a proceeding in which the sole, court-appointed expert opined that further neurological testing was desirable.

For these reasons, we conclude that any appellate court would conclude that the PCR court's factual determination as to Dr. Potts and its fact-finding process with respect to Claim 1 were unreasonable and inadequate. *See Taylor*, 366 F.3d at 1000. Accordingly, Jones has satisfied the requirements of § 2254(d)(2).

C

Although § 2254(d) typically also applies to the prejudice prong of a petitioner's IAC claim, here, the PCR court did not reach the issue of prejudice, and so we review the issue de novo. *See, e.g., Weeden*, 854 F.3d at 1071.

*Pinholster* limits our § 2254(d) analysis to the facts in the state court record. 563 U.S. at 185. However, *Pinholster* does not prevent us from considering evidence presented for the first time in federal district court in reviewing the merits

of Jones's claims de novo.  As the district court found, Jones satisfied the standard for an evidentiary hearing pursuant to § 2254(e)(2)[7].  That provision permits federal district courts to hold evidentiary hearings and consider new evidence when petitioners have exercised diligence in pursuing their claims in state court.  *See id.* ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."); *see id.* at 212–13 (Sotomayor, J., dissenting); *(Michael) Williams v. Taylor*, 529 U.S. 420, 436–37 (2000) ("*Michael Williams*").

Though § 2254(e)(2) limits the discretion of district courts to conduct evidentiary hearings, *Pinholster*, 563 U.S.

---

[7] Section 2254(e)(2) states that

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

at 203 n.20, it does not impose an express limit on "evidentiary hearings for petitioners who ha[ve] been diligent in state court." *Id.* at 213 (Sotomayor, J. dissenting); *see also Landrigan*, 550 U.S. at 473 n.1. Here, the federal district court determined that Jones had been diligent in attempting to develop the factual basis for Claims 1 and 2 in state court, and the State does not contest that determination now. The state court record shows that Jones was diligent. His PCR counsel requested funding for a neuropsychologist and "a thorough and independent neurological assessment" to assist in the development of Claims 1 and 2, but the PCR court denied the request. Therefore, the district court did not err in its expansion of the record, and we consider the evidence developed in federal district court in conducting de novo review of Jones's claims.

To prevail on his IAC claim, Jones must demonstrate that his trial counsel: (1) performed deficiently; and (2) Jones's defense was prejudiced by that deficient performance. *Strickland*, 466 U.S. at 687. He has done so.

For all the reasons set forth previously in our § 2254(d)(1) analysis, Jones has demonstrated that counsel's performance fell below an objective standard of reasonableness and below the prevailing professional norms at the time of Jones's proceedings.

Additionally, Jones has demonstrated that counsel's failure to obtain a defense mental health expert for the penalty phase of Jones's trial prejudiced the defense. Jones has demonstrated that there is a "reasonable probability" that had such an expert been retained, "the result of the proceeding would have been different." *Id.* at 694.

There is a reasonable probability that had counsel secured a defense mental health expert, that expert would have uncovered (and presented at sentencing) a wealth of available mitigating mental health evidence. The main mitigation witness in state court was Randy, Jones's second step-father. Randy erroneously testified that Jones enjoyed a stable home life after age seven, when Randy married Jones's mother, and yet the trial court found that his testimony was sufficient to prove a number of non-statutory mitigating circumstances. Had counsel secured a mental health expert, that expert could have provided substantial evidence—through neuropsychological testing or otherwise—that Jones suffered from mental illness, including evidence supporting any of the diagnoses made by experts in federal district court: (1) cognitive dysfunction (organic brain damage and a history of numerous closed-head injuries); (2) poly-substance abuse; (3) post-traumatic stress disorder ("PTSD"); (4) attention deficit/hyperactivity disorder ("AD/HD"); (5) mood disorder; (6) bipolar depressive disorder; and (7) a learning disorder. The experts retained in Jones's federal habeas proceedings provided significant evidence of these conditions, demonstrating that such evidence could have been uncovered and presented at sentencing.

Dr. Pablo Stewart, Chief of Psychiatric Services at the Haight Ashbury Free Clinic in San Francisco, California, testified at the federal evidentiary hearing. He estimated that he spent 130 hours working on Jones's case, in contrast to the four hours Dr. Potts was able to spend with Jones prior to sentencing. Dr. Stewart diagnosed Jones with cognitive dysfunction, PTSD, polysubstance abuse, and mood disorder, not otherwise specified. He ultimately concluded that "[t]he circumstances surrounding Mr. Weaver's death are a direct consequence of [Jones's] abused and unfortunate past."

Dr. Stewart testified to a number of factors that may have contributed to Jones's cognitive dysfunction that occurred before Jones was even born. He noted that Jones's mother, Peggy, worked in a chrome hub cab plating factory when she was pregnant with Jones, and chrome exposure may negatively affect a baby's birth. He testified that Peggy's prenatal diet was also of concern: Peggy reported that during her pregnancy with Jones, her diet consisted of cigarettes, coffee, and mayonnaise sandwiches. He expressed that the use of nicotine during pregnancy has been directly linked to cognitive dysfunction in children and caffeine exposure results in more difficult births. He also specified that Jones's father beat Peggy during her pregnancy such that there was a potential for physical trauma to the fetus. And he testified to Jones's traumatic and difficult birth: Jones was born in the breech position, with the umbilical cord wrapped around his neck, and forceps were used. He testified that any of these factors could have been potential contributors to Jones's cognitive dysfunction.

Dr. Stewart testified that Jones had suffered multiple serious head injuries over the course of his life, and he went into much greater detail than Randy had provided regarding Jones's head injuries at the state PCR proceeding. Randy had testified that Jones fell off a roof when he was approximately thirteen, fell off a scaffolding when he was approximately fifteen, was mugged while serving in the Marines, and experienced spontaneous blackouts around the age of four. By contrast, Dr. Stewart described an incident where Jones "was about eleven (11) years old, he fell, head-first off a roof onto the metal frame of a horizontal dolly, in an attempt to retrieve a ball. His eye hit the metal bar of the dolly. He was unconscious for about five (5) to ten (10) minutes." He also noted the fall when Jones was fifteen, but additionally, he

explained that "[a]s a young adult, Danny had at least three (3) car accidents where he lost consciousness." Further, "when Danny was about five-and-a-half (5 ½) years old, Peggy found Danny regaining consciousness, lying underneath the swing set. She suspected Eland, Danny's first step-father, had hit Danny or thrown him off the slide. Danny's face was red and he vomited, indicating he had a concussion." Dr. Stewart elaborated on the mugging Jones suffered while in the Marines: he was "found lying unconscious in a ditch along the highway, by a Morehead City Police Officer, who took him to the hospital. Danny had been mugged and beaten with a two-by-four."

Dr. Stewart discussed PTSD and explained that Jones suffered numerous traumatic experiences early in his life: he watched his first step-father hold a jigsaw to his mother's neck and threaten to kill her, he watched that same step-father shoot a gun at his mother, and on two separate occasions, his second step-father, Randy, pointed a gun to his own head and threatened to kill himself in front of Jones. He also noted that Randy beat Jones for no reason with a belt with a buckle and engaged in other forms of severe physical discipline. On cross-examination the state challenged Dr. Stewart's PTSD diagnosis because Dr. Stewart stated that Jones "had PTSD at the time of the murders," but did not state that Jones was having a flashback while committing the crimes. Dr. Stewart responded by explaining that while the media tends to show PTSD as being a person "who is thinking he's being ambushed and he takes people hostage," that only occurs "very, very rarely." He explained:

> The much more overwhelmingly more common thing that occurs is a person having a short fuse; a person overreacting to a

situation; a person finding themselves challenged by some things and then just going off; a person—and that's PTSD. A person who drinks too much and then gets into fights, those are the more common thing. But those don't sell movies or books.

But that's the more common presentation. So that's why I'm saying in the case of Mr. Jones, it's absolutely clear that he suffers from PTSD, in my opinion, and that he carries that with him throughout his entire life. Certainly on the day of these murders, that was going on.

Dr. Stewart also testified that Jones's first step-grandfather forced Jones to drink alcohol when he was only nine years old, and that it appeared the grandfather used alcohol to get Jones drunk so it would be easier to sexually abuse him. Dr. Stewart described the sexual abuse "as full contact sexual abuse, including sodomy, including oral sex, both the providing it and receiving it." Jones became a daily marijuana user when he was in junior high, he used one gram of cocaine every weekend in high school, and he reported using LSD two hundred times. Dr. Stewart explained that the substance abuse appeared to have stemmed from Jones's genetic predisposition, and also because Jones used drugs starting at a very young age to self-medicate as a means of coping with his mental defects and past trauma.

Dr. Alan Goldberg, a psychologist in Arizona with a speciality in neuropsychology, conducted a battery of tests that covered multiple domains of cognitive functioning. Dr. Goldberg gave Jones approximately twenty-five tests and

found that "when we look at the patterns across many different kinds of tests . . . we see a consistent inconsistency in performance, that is, the performance is problematic on a number of tests that all have an attention component to them." He ultimately diagnosed Jones with a learning disability, attention deficit disorder, and Bipolar Disorder, Depressed.

Jones submitted reports from additional experts, including Dr. David Foy, a professor of psychology at Pepperdine University. Dr. Foy diagnosed Jones with PTSD, polydrug abuse, depressive disorder, compromised cognitive emotional functioning, and various learning deficits. Dr. Foy described the numerous instances of life-threatening family violence Jones witnessed growing up, and found that on at least two occasions Jones used a baseball bat to protect himself: (1) when Jones threatened to kill Jones's first step-father if he did not stop beating Jones's mother, Peggy; and (2) in order to stop Jones's first step-grandfather from continuing to sexually abuse him. Dr. Foy concluded that

> [t]he constant threat of sudden verbal attacks or severe physical punishment in Danny's home environment would be expected to produce an essential state of wariness or hypervigilance . . . [and] would be expected to lead to a heightened suspiciousness and combat readiness as a systematic way of responding, even in situations which later proved to be non-life threatening.

Finally, Jones submitted a declaration from his younger sister, Carrie. She said that, as a child, Jones twice watched Randy point a gun at his own head and threaten to kill

himself. She stated that contrary to Randy's testimony during sentencing, Randy was both verbally and physically abusive to Jones, and that Jones threatened to kill Randy if he kept beating Peggy. Carrie also confirmed that Jones suffered numerous head injuries while growing up.

The hearing also made clear that Dr. Potts had not been tasked with providing mitigation evidence at sentencing and had not conducted the extensive testing he felt was required. Potts explained: "I was not an expert for either party. I was the Court's expert in looking at some issues. I was not—it was clear I was not hired for mitigation, nor was I hired for aggravation." The trial court had ordered Dr. Potts to perform an evaluation pursuant to Rule 26.5 of the Arizona Rules of Criminal Procedure. The Rule provides: "At any time before the court pronounces a sentence, it may order the defendant to undergo a mental health examination or diagnostic evaluation. Unless the court orders otherwise, any report concerning such an examination or evaluation is due at the same time as the presentence report." In line with this, Dr. Potts had testified at Jones's sentencing: "My main role is working with Maricopa County Superior Court, criminal division, coordinating competency evaluations, other forensic, and working with patients. I also have clinical responsibilities. . . . [I] [p]rimarily do reports as requested by the Court." When asked whether or not he had enough "points of data" to pull from in reaching his conclusions, he stated:

> [T]here's a clear distinction between a mitigation specialist, and I'm no mitigation specialist. I may be a part of a team of mitigation, but I'm clearly not a mitigation

> specialist in the realm of what is dealt with now in capital cases. . . .
>
> Mine was a cursory examination. . . . [I]nterviewing one family member certainly is not adequate, I believe, for what would be considered capital mitigation. It is below the standard of care.

He stated that, prior to his testimony at sentencing, he had recommended that defense counsel seek neuropsychological testing for Jones. During cross-examination, the State tried to get Dr. Potts to admit that he only called for neurological testing, not neuropsychological testing, but Dr. Potts explained that "[s]ophisticated neurological testing would include that."

He described the reports submitted by the additional experts at the habeas proceeding as the "documents I think one would expect to see in mitigation. . . . I believe they're very, very helpful, and I think—I know I would have liked to have had the exhaustive nature of these reports." He stated that he found his role constrained by his court-appointed status, and therefore "did not make diagnoses," because his "role was not to make diagnoses . . . and that's why I would not have. I could have . . . but that was not the nature or tenor of any of this report. . . ."

Defense trial counsel testified that Dr. Potts "did not act as a neutral, detached court-appointed expert. He actively assisted us in developing mitigation, planning strategy to a much larger degree than what he indicated." He explained that he had "numerous phone conversations" with Dr. Potts, they met together the night before Dr. Potts testified, and

Dr. Potts "stressed to ask for the continuance for the additional testing."

The testimony provided at the federal evidentiary hearing demonstrates the types of mitigation evidence that could and should have been presented at the penalty phase of Jones's trial. For instance, the evidence demonstrates that, had counsel retained a defense mental health expert, that expert could have provided testimony explaining the factors that contributed to Jones's cognitive dysfunction, including: (1) prenatal chrome and nicotine exposure; (2) his mother's malnutrition during pregnancy; (3) fetal trauma from beatings by his father; (4) a traumatic birth; (5) several severe head injuries; or (6) Jones's substantial and extensive drug and alcohol abuse, which began when he was eight or nine years old. Any such evidence would have been significantly more probative of Jones's mental state and more persuasive in reducing Jones's culpability than Dr. Potts's conditional findings, compiled after far less preparation time and testing, and comprising only a six-page report. These factors illustrate how unfortunate circumstances outside of Jones's control combined to damage his cognitive functioning and mental health at the time of his crimes.

Likewise, the mental health experts' testimony in the district court proceedings demonstrates that had trial counsel retained such an expert for sentencing, he or she could have provided evidence that Jones's mental state was impaired by drugs and alcohol at the time of his crimes. He or she also could have offered context for his substance abuse and insight into how Jones's long-term self-medication affected his brain. As demonstrated at the federal evidentiary hearing, any mental health expert engaged by the defense team would have attempted to explain Jones's lifelong history of substance

abuse and its physical effects on Jones's brain. This would have included compiling a family history and hard data regarding Jones's brain function. It also would have included information addressing how and when Jones's substance abuse began. As the federal proceedings revealed, Jones turned to substance abuse at an extremely young age in order to self-medicate in response to the trauma he experienced from being physically and sexually abused and as a result of repeatedly witnessing violence directed at his mother. A mental health expert would have relayed that Jones suffered sexual abuse from age nine until age thirteen at the hands of his step-grandfather, who introduced him to marijuana and alcohol at age nine in order to facilitate that abuse. A mental health expert could also have explained the trauma Randy inflicted on Jones by detailing how Randy physically and emotionally abused Jones, engaged in various forms of severe physical discipline, and threatened suicide in front of Jones and his family.

We are persuaded that testimony explaining Jones's history would have significantly impacted the overall presentation of Jones's culpability with respect to his mental state, and painted a vastly different picture of Jones's childhood and upbringing. The mitigation case actually presented to the sentencing court suggested that while Jones had undergone a traumatic early childhood, he enjoyed a largely normal childhood and supportive family after the age of six. And because so little preparation had been done, Dr. Potts erroneously testified at sentencing that Jones did not suffer child abuse once Randy and Peggy married. Notably, Randy was the only mitigation witness who testified at Jones's sentencing, and defense counsel was unaware that Randy too was an abuser. Had counsel procured a mental health expert, the mitigation case would have told the story of

an individual whose entire childhood was marred by extreme physical and emotional abuse, which in turn funneled him into early onset substance abuse that exacerbated existing cognitive dysfunction.

In sum, there is at least a reasonable probability that development and presentation of mental health expert testimony would have changed the result of the sentencing proceeding. Therefore, we conclude that Jones has demonstrated *Strickland* prejudice on de novo review. *See Boyde v. California*, 494 U.S. 370, 382 (1990) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, *may be less culpable than defendants who have no such excuse*." (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989))). Accordingly, we reverse the district court's denial of relief on Claim 1.

V

A

In Claim 2, Jones asserts that his trial counsel was constitutionally ineffective by failing to seek neurological or neuropsychological testing prior to sentencing. He asserts that the failure to do so fell below prevailing professional norms at the time. We agree.

As with Claim 1, counsel's failure to promptly seek neuropsychological testing ran contrary to his obligation to pursue reasonable investigations under *Strickland*, and in particular, his obligation to investigate and present evidence

of a defendant's mental defect. *See Terry Williams*, 529 U.S. at 396 (failure to investigate and present evidence of mental defect amounts to deficient performance). The state court record shows that counsel was on notice of numerous facts from the very beginning of the representation that Jones may have had significant brain damage. "[W]hen 'tantalizing indications in the record' suggest that certain mitigating evidence may be available, those leads must be pursued." *Lambright*, 490 F.3d at 1117 (quoting *Stankewitz v. Woodford*, 365 F.3d 706, 719–20 (9th Cir. 2004)); *see also Wiggins*, 539 U.S. at 527 ("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."). Counsel specified in his declaration before the PCR court that "prior to trial and sentencing [he] was aware from interviews of Danny Jones and his mother and step-father that he had been rendered unconscious numerous times during his life from head injuries," as well as that "he had a significant history of serious long term substance abuse." Any reasonable attorney would understand that these details could lead to valuable, available mitigation evidence and would have pursued these leads further.

However, in the state PCR proceedings, defense trial counsel provided no strategic reason for his failure to arrange for neuropsychological testing. Instead, trial counsel stated that he "was not aware that neurological or neuropsychological testing was necessary and available which could determine the exact nature of injuries to Danny Jones' brain from long term substance abuse and head injury," nor that testing would shine a light on "the resulting affect on his behavior and conduct." Counsel's failure to

appreciate the importance of such testing before the sentencing phase of trial constituted deficient performance because he failed to understand the value neuropsychological testing could provide in Jones's case, and by the time of Jones's sentencing in 1993, counsel in capital cases was expected to be versed in the role of psychiatric evidence. *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 5.1(1)(A)(v), p. 5–6 (1989) ("Lead trial counsel assignments should be distributed to attorneys who . . . are familiar with and experienced in the utilization of expert witnesses and evidence, including, but not limited to, psychiatric and forensic evidence.").

Counsel's request for testing (and a continuance) during Jones's sentencing hearing came far too late. As noted by PCR counsel, the court denied these requests because it had granted funding earlier in the case for expert assistance, and "if there [had been] any follow-up questions of a psychological or neurological nature, [the court expected] that the defense would have followed them up." The court, therefore, was placing the burden on counsel to recognize these issues and request funding and assistance earlier in the case, which counsel failed to do because he had not invested sufficient preparation time and research to be aware that such testing was available and needed. Moreover, the timing of counsel's request for neuropsychological testing, like his request for a defense mental health expert, was in itself deficient. "[P]reparation for the sentencing phase of a capital case should begin early and even inform preparation for a trial's guilt phase." *Allen*, 395 F.3d at 1001. For this reason,

the PCR court's decision that defense counsel's performance did not fall below an objectively reasonable standard was an unreasonable application of *Strickland*. Jones has satisfied § 2254(d)(1).

B

Alternatively, Jones asserts that the state PCR court's decision was based on an unreasonable determination of the facts under § 2254(d)(2). He argues that the court precluded Claim 2's full factual development by denying PCR counsel's request to fund neuropsychological testing, and he asserts that the inadequacy of the state court's fact-finding procedures renders its rejection of this claim unreasonable. We agree.

The PCR court never addressed the facts supporting Jones's IAC claim, and it excused counsel's failure to move timely for neuropsychological testing in a vague, inconsistent order. As with Claim 1, this had the effect of precluding Claim 2's full factual development in a way that rendered the entire fact-finding process unreasonable.

At sentencing, Dr. Potts testified that he saw indicators of brain damage, and as a result, counsel requested that the court continue the proceedings so that he could seek a neuropsychological evaluation. The court, however, ruled contrary to Dr. Pott's recommendation, stating only that:

> this case has been pending a long time, and I think the evidence is *very slim, nonexistent, in fact*, that the defendant has anything that

> requires any kind of neurological examination. So, I am ready to proceed [with sentencing].

(emphasis added). Because the State did not call a competing expert, the only evidence in the record—Dr. Pott's unambiguous recommendation—suggested that a neuropsychological evaluation was necessary, contrary to the sentencing court's assessment. The sentencing court's cursory evaluation of the record effectively foreclosed any factual development on this issue.

In the PCR proceedings, the court at least granted a hearing on the issue of counsel's ineffectiveness regarding testing, but because the court summarily denied the claim concerning the appointment of a mental health expert and denied counsel's motion for further neuropsychological testing, the evidentiary hearing was rendered almost meaningless. The court based its denial of neuropsychological testing on the court's own impressions and untested memory of Dr. Potts's sentencing testimony from six years prior. The court recalled that he "thought Dr. Potts did a good job," and "based on his testimony," the court did not "really see any grounds for any additional psychiatric or psychological testing." But Dr. Potts's testimony was that additional neuropsychological testing *was* needed. The court paradoxically explained that "[b]ased on [Dr. Potts's] testimony and the other things that I heard during that hearing, there was no grounds in my mind for obtaining a neuropsychological examination. Not one." The resulting decision dismissed the claim for neuropsychological testing in a single sentence: "The report and testimony of Dr. Potts who was appointed by the Court, adequately addressed defendant's mental health issues at sentencing."

As with Claim 1, the state PCR judge made factual findings regarding the necessity of neuropsychological testing, not on the basis of evidence presented by the petitioner, but on the basis of his own personal conduct, untested memory, and understanding of events. *See Hurles*, 752 F.3d at 791; *see also Buffalo v. Sunn*, 854 F.2d 1158, 1165 (9th Cir. 1988) (finding error when the court relied on "personal knowledge" to resolve disputed issue of fact). Additionally, in making the resulting factual finding—that neuropsychological testing was not warranted—the court "plainly misapprehend[ed]" the record. *See Taylor*, 366 F.3d at 1001. In particular, the evidence in the record—Dr. Potts's testimony—strongly suggested that neuropsychological testing *was* essential in assessing Jones's psychological state, contrary to the court's finding. Thus, by finding against the weight of the evidence, and proceeding to rule on the merits of Claim 2, the court employed a constitutionally defective fact-finding process and ruled on an unconstitutionally incomplete factual record. *See id.* at 999; *see also Milke*, 711 F.3d at 1007 (finding the state court decision rested on an unreasonable determination of the facts where the judge relied on a distorted fact-finding process and ruled on an "unconstitutionally incomplete record").

The PCR court had an obligation to allow for reasonable fact development in reaching the merits of Claim 2; the judge did not fulfill this obligation by relying on his own untested, personal recollection of the testimony Dr. Potts presented six years earlier. For this reason, Jones has demonstrated that the PCR court's decision was based on an unreasonable fact-finding process and determination of the facts, satisfying § 2254(d)(2).

C

As with Claim 1, the PCR court failed to reach the prejudice prong of Claim 2, and so we address the issue de novo. *See, e.g., Weeden*, 854 F.3d at 1071.

As with Claim 1, because Jones was diligent in attempting to develop the factual basis of this claim in state court by requesting "a thorough and independent neurological assessment," § 2254(e)(2) does not limit our ability to consider evidence presented for the first time in federal district court. *See Pinholster*, 563 U.S. at 213 (Sotomayor, J. dissenting); *see also Landrigan*, 550 U.S. at 473 n.1. The State does not contest that Jones was diligent in attempting to develop the factual basis for his claims in state court, or that we may consider this additional evidence on appeal. And having reviewed the record, we independently conclude that the district court did not err in its diligence determination and expansion of the record. Accordingly, we consider the evidence developed in federal district court in conducting de novo review of Jones's claims.

In order for us to grant relief on Jones's IAC claim, Jones must demonstrate that his trial counsel: (1) performed deficiently; and (2) Jones's defense was prejudiced by that deficient performance. *Strickland*, 466 U.S. at 687. He has done so.

Jones has demonstrated that trial counsel performed deficiently for all the reasons set forth in our § 2254(d)(1) analysis. He has demonstrated that counsel's performance fell below an objective standard of reasonableness and below the prevailing professional norms at the time of Jones's proceedings.

Additionally, Jones has demonstrated that counsel's failure to seek neuropsychological and neurological testing prejudiced his defense. He has demonstrated that there is a "reasonable probability" that had such testing been conducted, and had the results been presented at sentencing, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. While Dr. Potts presented brief, conditional findings, the results of the neuropsychological and neurological tests conducted by various experts during Jones's federal district court proceedings confirmed that Jones suffered from a variety of psychological disorders stemming from birth and exacerbated by long-term drug use and trauma that affected Jones's cognitive functioning. As explained previously, testing revealed that Jones suffered from organic brain damage, poly-substance abuse, PTSD, AD/HD, mood disorder, bipolar depressive disorder, and a learning disorder. The presentation of these results would involve presenting the contributing factors to his cognitive dysfunction, as previously described with respect to Claim 1, including that his long-term substance abuse was induced by his sexually abusive step-grandfather. At sentencing, there was no indication that Jones had suffered years of sexual abuse as a child. In combination, the testing results and the presentation of contributing factors would have dramatically affected any sentencing judge's perception of Jones's culpability for his crimes such that there is a reasonable probability that Jones would not have received a death sentence.

VI

Because we have determined that Jones is entitled to relief and resentencing on the basis of Claims 1 and 2, we need not and do not reach the issue of whether the new

evidence presented at the federal evidentiary hearing fundamentally altered these claims such that they were unexhausted, procedurally defaulted, and excused in light of *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc) and *Martinez v. Ryan*, 566 U.S. 1 (2012). Additionally, we need not and do not reach the merits of any of Jones's other claims.

We reverse and remand to the district court with instructions to issue the writ of habeas corpus.

**REVERSED AND REMANDED.**